UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY TAYLOR
2222 Dewey Avenue
Beloit, WI 53511

        Plaintiff,

      vs.                          Case No: 14-CV-628

DATA DIMENSIONS CORP.        **JURY TRIAL DEMANDED**
400 Midland Court
Janesville, WI 53547

        Defendant.

## COMPLAINT

COMES NOW the Plaintiff, Stacy Taylor, by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against the Defendant, alleges and shows to the Court as follows:

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this case involves a federal question under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA").

2.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's state law claims, because they are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c), because a substantial portion of the events or omissions giving rise to the claims occurred in this District, and Defendant has substantial and systematic contacts in this District.

## THE PARTIES

4. Plaintiff, Stacy Taylor, is an adult resident of the State of Wisconsin residing in Rock County with a post office address of 2222 Dewey Avenue, Beloit, Wisconsin 53511.

5. Defendant, Data Dimensions Corp., is a Wisconsin corporation with a principal office of 400 Midland Court, Janesville, Wisconsin 53547.

6. Defendant provides business process automation services, including, but not limited to, document imaging and storage retrieval services.

7. Upon information and belief, Defendant operates locations in Janesville, Wisconsin; Brookfield, Wisconsin; Milwaukee, Wisconsin; and Clinton, Iowa.

8. Defendant employed Ms. Taylor as a non-exempt, hourly employee at Defendant's Janesville, Wisconsin location within the three years preceding the filing of this Complaint.

9. Ms. Taylor's last day of work at Defendant was January 16, 2014.

## DATA DIMENSIONS' GOVERNMENT CONTRACT

10. Defendant hired Ms. Taylor subsequent to receiving a federal government contract to provide processing and automating of medical records services for the Veterans' Administration.

11. In or about August 2012, Defendant announced that it received a federal government contract to provide processing and automating of medical records services for the Veterans' Administration.

12. The federal government contract Defendant announced in or about August 2012 was a subcontract under Systems Made Simple, which was the primary government contractor.

2

13.     In or about August 2012, the Janesville Gazette reported that Defendant would hire new employees as a result of receiving the federal government contract to provide processing and automating of medical records services for the Veterans' Administration.

14.     In or about August 2012, the Janesville Gazette reported that Defendant's new employees working on the federal government contract will be paid between $12.50 and $15.50 per hour.

15.     In or about August 2012, the Janesville Gazette reported that Defendant's new employees working on the federal government contract will be paid between $12.50 and $15.50 per hour under government requirements.

## MS. TAYLOR'S POSITION AT DATA DIMENSIONS

16.     Defendant sent Ms. Taylor a written offer of employment on December 26, 2012 (the "offer of employment").

17.     Defendant's offer of employment to Ms. Taylor stated that she was to begin working for Defendant on December 31, 2012.

18.     Defendant's offer of employment to Ms. Taylor offered Ms. Taylor the position of Document Processor I – 1st Shift at Defendant.

19.     Defendant's offer of employment to Ms. Taylor stated "Your hourly compensation will be $12.51."

20.     Defendant's offer of employment to Ms. Taylor stated, "The position you are accepting is potentially eligible for pay based on a piece rate basis."

21.     Defendant's offer of employment to Ms. Taylor stated, "The decision to move to the piece rate system is not targeted for several months. Once we have determined the dates for transition to the piece rate pay system, we will provide a minimum of a 30 day notice."

22.     Defendant's offer of employment stated, "The piece rate system will be based upon the base rate of pay above as the minimum hourly rate, with an opportunity to earn a higher wage based on your hourly throughput productivity."

23.     On or about December 26, 2012, Ms. Taylor accepted Defendant's offer of employment.

24.     On or about December 31, 2012, Ms. Taylor began working at Defendant as a Document Processor I at Defendant's Janesville, Wisconsin location.

25.     As a Document Processor I, Ms. Taylor was a non-exempt, hourly employee and earned $12.51 per hour.

26.     As a Document Processor I, Defendant employed Ms. Taylor full-time (approximately forty (40) hours or more per work week).

27.     As a Document Processor I, Ms. Taylor's job duties included sorting, coding, and preparing work as outlined in instructions using pre-determined work methods and procedures.

28.     As a Document Processor I, Ms. Taylor prepared military veteran's files for scanning by other employees of Defendant so the materials could be stored in a digital format by the Veterans' Administration.

29.     As a Document Process I, Ms. Taylor prepared document header sheets ("header sheets") to identify and separate the military veteran's files so Defendant's scanners and software could identify when one document began and ended or when one veteran's files began and ended. To prepare header sheets, Ms. Taylor recorded the date of the documents to be scanned, coded the document according to Defendant's master list, and provided other details regarding the document.

30.     Ms. Taylor began working for Defendant on December 31, 2012.

4

## DEFENDANT CHANGES EMPLOYEE COMPENSATION

31.     On or about February 18, 2013, Defendant distributed an Operations Memorandum to employees with the subject line "VBA PROJECT: PIECE RATES AND PRODUCTIVITY" (hereinafter "Operations Memorandum").

32.     Defendant's Operations Memorandum informed Defendant's employees they would be paid on a piece rate basis beginning March 3, 2013.

33.     Defendant's Operations Memorandum stated:

> We are initially setting the piece rate based on an Overall Productive Rate of 380 pages per hour. Overall productive rate is based on your total clock time. This means your pages per hour during your 93.5% productive time, or your Productive Time Rate, needs to be 406.42 pages per hour. The reports you receive track your productive time and your throughput during that productive time. It also tracks all pages, not just the VBA pages, meaning it includes the document header sheets you place at the beginning of each document.

34.     Defendant's Operations Memorandum stated:

> We are not setting piece rates based upon what you can do. Piece rates are being set based on what we need to attain from a cost perspective to ensure we are profitable on this project. If we are not profitable on the project, there will be no project. We need productivity to increase immediately.

35.     Defendant told Document Processing I employees, including Ms. Taylor, that each would be compensated on a piece rate basis that included the header sheets each employee completed and processed along with the Veterans Administration materials each employee processed.

36.     After on or about March 3, 2013, Defendant paid its employees on a piece rate basis.

5

37.     After on or about March 3, 2013, Defendant's employees' pay rate fluctuated from week-to-week and employee-to-employee on the piece rate basis.

38.     Defendant distributed a report with each employee's pay check that contained information used to determine employee compensation under the piece rate basis of pay for each pay period (the "Productivity Report").

39.     The Productivity Report included information with respect to each employee's hours worked during the pay period.

40.     The Productivity Report included information with respect to each employee's units processed. The units processed identified on the Productivity Report purported to show the number of pages the employee processed over the pay period.

41.     The Productivity Report included information with respect to each employee's units processed per hour. Defendant calculated the employee's units processed per hour by dividing the units processed by the hours worked.

42.     The Productivity Report included information with respect to the applicable piece compensation. The piece rate compensation an employee received for a pay period was determined by Defendant. Defendant based the piece rate its employees received on the rate of pages Defendant needed to be processed per day for the Veterans' Administration project to be profitable for Defendant.

43.     Defendant changed the piece rate multiple times over the course of Ms. Taylor's employment.

44.     The Productivity Report included information with respect to the employee's earnings. Defendant calculated the employee's earnings by multiplying the units processed by the piece rate and rounded to the nearest hundredth.

45.     The Productivity Report included information on the employee's average hourly rate per job. Defendant calculated the employee's average hourly rate per job by dividing the employee's earnings by the hours worked and rounded to the nearest hundredth.

46.     Defendant maintained a Document Processing Statistics report for each employee that contained information Defendant used to determine each employee's compensation (the "DPS report").

47.     The DPS report included a "Time In Hours" column. In the Time In Hours column, Defendant listed the hours worked by the employee, rounded to the nearest hundredth.

48.     The DPS report included a "Ddc Pages" column. In the Ddc Pages column, Defendant listed the number of header sheets prepared by the employee.

49.     The DPS report included a "Client Pages" column. In the Client Pages column, Defendant listed the number of Veterans Administration pages prepared by the employee.

50.     The DPS report included a "Client Pages/Hour column." In the Client Pages/Hour column, Defendant listed the Client Pages number divided by the Time In Hours number.

51.     The DPS report provided the information described in paragraphs 46 to 50 by employee project, day, and two-week total.

52.     The Client Pages/Hour column's two-week total information on an employee's DPS Report is the same number as the Units Processed Per Hour on the employee's Productivity Report.

53.     Defendant did not include the employee's Ddc Pages column information on the DPS report to determine the employee's Units Processed Per Hour information on the Productivity Report.

54.     Defendant did not include the number of header sheets an employee prepared in the pay period to calculate the employee's Units Processed Per Hour on the Productivity Report.

55.     Defendant did not notify its employees that it maintained DPS reports.

56.     Defendant did not notify its employees that its DPS reports were available to review.

57.     Defendant did not distribute DPS reports to employees without solicitation by the employee for the DPS report. Defendant's employees had to ask Defendant for the DPS report for any pay period to receive it.

## MS. TAYLOR REPEATEDLY COMPLAINS TO DEFENDANT ABOUT THE LAWFULNESS OF DEFENDANT'S PIECE RATE PAY SYSTEM

58.     On or about July 12, 2013, Ms. Taylor met with Amanda Gonzalez, Defendant's Human Resources representative, regarding her (Ms. Taylor's) concerns of the lawfulness of Defendant's piece rate pay system ("the July 12, 2013 meeting).

59.     During the July 12, 2013 meeting, Ms. Taylor told Gonzalez, "The scanners are misfeeding. The scanners are putting six to eight pieces of paper into one feed, into one image. That means the vets are not getting their benefits. And that means I'm not getting paid or whoever's not getting paid for five of the pieces of paper, seven of the pieces of paper," or words to that effect.

60.     During the July 12, 2013 meeting, Ms. Taylor told Gonzalez, "I don't think we should be on piece rate for this job. The Department of Workforce Development website states how piece rate should be configured, and this is not it," or words to that effect.

61.     On or about October 21, 2013, Ms. Taylor met with Ted Heyel, Defendant's Human Resources Coordinator ("the October 21, 2013 meeting).

62.     Brenda Gillam, Defendant's Human Resources Representative, was also present at the October 21, 2013 meeting.

63.     During the October 21, 2013 meeting, Ms. Taylor told Heyel, "I'm not getting paid for deconstructing a thousand little manila folders. How does that work out in the piece rate?" or words to that effect.

64.     During the October 21, 2013 meeting, Ms. Taylor told Heyel, "You're sitting there trying to take the rubber bands off of these folders, take staples off. Huge stacks of manila folders," or words to that effect.

65.     During the October 21, 2013 meeting, Ms. Taylor told Heyel, "It takes forever. I'm not getting paid for that crap," or words to that effect.

66.     During the October 21, 2013 meeting, Heyel laughed in response to Ms. Taylor's statements described in paragraphs 63 to 65 above.

67.     During the October 21, 2013 meeting, Ms. Taylor told Heyel that Defendant was not meeting federal government contract requirements because Defendant did not pay Ms. Taylor a prevailing wage.

68.     During the October 21, 2013 meeting, Ms. Taylor told Heyel that Defendant was not meeting federal government contract requirements because Defendant did not pay Ms. Taylor at least an hourly rate of $12.51.

69.     During the October 21, 2013 meeting, and in response to Ms. Taylor's statements described in paragraphs 67 to 68 above, Heyel stated, "Yeah, it's because we're not really working for the government" or words to that effect.

70.     During the October 21, 2013 meeting, Gillam stated, "We'll take it to our boss' attention," or words to that effect.

71.     Immediately following the October 21, 2013 meeting, Ms. Taylor told Heyel, "I'm sorry but I'm not getting paid for doing that. My job starts when those folders are taken apart, when I'm actually able to work the job. I've got to take a thousand staples out," or words to that effect.

72.     Immediately following the October 21, 2013 meeting, Ms. Taylor told Heyel, "I've got to take a thousand staples out before I can even start working. How much time does that take?" or words to that effect.

73.     In response to Ms. Taylor's statement described in paragraph 72 above, Heyel told Ms. Taylor, "You know what they're (Defendant) going to say though. It's all part of the job," or words to that effect.

74.     Immediately following the October 21, 2013 meeting, Ms. Taylor told Heyel, "I'm about to go to the VA with it. Quite seriously. Lose a job, lose a job. I like my job. I like what I do. I like the fact that I'm helping veterans, but if I'm not getting paid for it, what's the flipping point. I've got kids to feed," or words to that effect.

## MS. TAYLOR COMPLAINS TO DEFENDANT ABOUT DEFENDANT'S FAILURE TO KEEP ACCURATE RECORDS AND IS TERMINATED

75.     On or about January 14, 2014, Ms. Taylor met with Heyel in his office ("the January 14, 2014 meeting").

76.     During the January 14, 2014 meeting, Ms. Taylor discussed with Heyel Defendant's compensation and recordkeeping practices.

77.     During the January 14, 2014 meeting, Ms. Taylor discussed with Heyel whether Defendant accurately counted pages of work Defendant's employees completed to determine their piece-rate compensation.

78.     During the January 14, 2014 meeting, Ms. Taylor discussed with Heyel Defendant's instructions to Rosa Malone, Defendant's employee, to refrain from discussing compensation issues in the workplace.

79.     During the January 14, 2014 meeting, Ms. Taylor told Heyel, "It's not ok for Karen to tell an employee that if she talks about pay and wages that she can be terminated," or words to that effect.

80.     During the January 14, 2014 meeting, Ms. Taylor told Heyel, "It's against federal law to tell an employee they can't talk about pay and wages," or words to that effect.

81.     During the January 14, 2014 meeting, Ms. Taylor told Heyel, "We are only paid for client pages, which is the personnel files," or words to that effect.

82.     During the January 14, 2014 meeting, Ms. Taylor told Heyel, "I'm going to submit it to wage and hour division at labor standards," or words to that effect.

83.     In response to Ms. Taylor, Heyel told her, "That report is just showing you how many doc sep sheets you filled out and how many VA documents you inserted," or words to that effect. The "report" to which Heyel referred was the DPS report.

84.     On January 16, 2014, Heyel and Karen Hallet, Defendant's Director of Human Resources, met with Ms. Taylor ("the January 16, 2014 meeting").

85.     Prior to the January 16, 2014 meeting, Heyel and Hallet did not inform Ms. Taylor of the purpose of the January 16, 2014 meeting.

86.     During the January 16, 2014 meeting, Defendant terminated Ms. Taylor's employment.

87.     During the January 16, 2014 meeting, Hallet stated to Ms. Taylor, "So I got some reports and then I came up to Ted to find out that yesterday you came in here very aggressive or

were being very aggressive," or words to that effect. Hallet was referring to the June 14, 2014 meeting.

88.     During the January 16, 2014 meeting, Hallet stated to Ms. Taylor, "Yesterday is when I got the report. So I came to Ted to talk to him about it and he described it and it sounds less than professional." Hallet was referring to the June 14, 2014 meeting.

89.     During the January 16, 2014 meeting, Hallet stated to Ms. Taylor, "I'm going to terminate your employment."

90.     Immediately following the January 16, 2014 meeting, Defendant had Ms. Taylor escorted from the workplace.

91.     At the time Defendant terminated Ms. Taylor's employment, Defendant owed Ms. Taylor no less than eighty-four (84) hours of unpaid vacation and floating holiday time.

92.     At the time Defendant terminated Ms. Taylor's employment, Defendant owed Ms. Taylor no less than $400 in an employee referral bonus.

93.     An investigation of Defendant conducted by the U.S. Department of Labor, Wage and Hour Division subsequent to Ms. Taylor's termination substantiated the wage allegations Ms. Taylor made to Defendant throughout the course of her employment with Defendant.

## FIRST CAUSE OF ACTION – RETALIATION UNDER THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED

94.     Ms. Taylor realleges and incorporates paragraphs 1 to 93 of this Complaint by reference.

95.     Ms. Taylor's statements to Heyel during the January 14, 2014 meeting expressly stated her belief that Defendant was not properly compensating her pursuant to the FLSA.

96.     Ms. Taylor's statements during the January 14, 2014 meeting constituted "filing a complaint" within the meaning of the FLSA.

97.     Defendant violated the FLSA, 29 U.S.C. § 215(a)(3), by terminating Ms. Taylor's employment because she made a complaint and indicated that she planned to take legal action against Defendant relating to its alleged violations of the overtime provisions of the FLSA.

98.     Defendant retaliated against Ms. Taylor by terminating her employment for exercising her rights under the FLSA, 29 U.S.C. § 201 *et seq.*

99.     FLSA, 29 U.S.C. § 216(b) makes an employer who violates FLSA, 29 U.S.C. § 215(a)(3) liable for such legal or equitable relief as may be appropriate to effectuate the purposes of Section 215(a)(3), including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

## SECOND CAUSE OF ACTION – VIOLATION OF WISCONSIN WAGE PAYMENT AND COLLECTION LAWS FAILURE TO PAY AGREED UPON WAGE

100.    Ms. Taylor realleges and incorporates paragraphs 1 to 99 of this Complaint by reference.

101.    At all relevant times, Ms. Taylor was an employee of Defendant within the meaning of Wis. Stat. § 109.01(1r).

102.    At all relevant times, Defendant was an employer of Ms. Taylor within the meaning of Wis. Stat. § 109.01(2).

103.    Ms. Taylor has been entitled payment from Defendant at the agreed upon wage, as defined in Wis. Stat. § 109.01(3), for each hour worked by Ms. Taylor pursuant to Wis. Stat. § 109.03.

104.    Defendant violated the Wisconsin Wage Payment and Collection Laws (the "WWPCL") by failing to properly compensate Ms. Taylor for each hour she worked by willfully engaging in inaccurate record keeping as described above.

13

105.    Defendant violated the WWPCL by failing to properly compensate Ms. Taylor for all unpaid vacation and floating holiday time she accrued while employed by Defendant.

106.    Defendant violated the WWPCL by failing to properly compensate Ms. Taylor for the employee referral bonus she earned at the time of her termination.

107.    As set forth above, Ms. Taylor sustained losses in her compensation as a proximate result of Defendant's violations. Accordingly, Ms. Taylor seeks damages in the amount of her unpaid compensation, injunctive relief requiring Defendant to cease and desist from their violations of the Wisconsin laws described herein and to comply with them, and such other legal and equitable relief as the Court deems just and proper. Under Wis. Stat. § 109.11, Ms. Taylor may be entitled to liquidated damages equal and up to fifty percent (50%) of the unpaid wages.

108.    Ms. Taylor seeks recovery of attorneys' fees and the costs of this action to be paid by Defendant, pursuant to the WWPCL.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1.      Issue an Order, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring Defendants' actions as described in the Complaint as unlawful and in violation of the FLSA and Wisconsin Law and applicable regulations and are and were willful as defined in the FLSA and Wisconsin Law;

2.      Issue an Order directing and requiring Defendant to pay Ms. Taylor damages in the form of reimbursement for unpaid overtime wages for all time spent performing compensable work for which she was not paid pursuant to the rate provided by the FLSA and WWPCL;

3.      Issue an Order directing and requiring Defendant to pay Ms. Taylor damages in the form of reimbursement for unpaid agreed upon wages for all time spent performing compensable

work for which she was not paid pursuant to the rate provided by the FLSA and WWPCL;

4.        Issue an Order directing and requiring Defendant to pay Ms. Taylor liquidated damages pursuant to the FLSA and WWPCL in an amount equal to, and in addition to the amount of wages and overtime wages owed to her;

5.        Issue an Order directing and requiring Defendant to reinstate Ms. Taylor to her former position without any loss of seniority or benefits;

6.        Issue an Order directing and requiring Defendant to pay Ms. Taylor damages in the form of back pay from the time of her termination until the date of her reinstatement as a result of Defendant's unlawful termination of Plaintiff;

7.        Issue an Order directing Defendant to reimburse Ms. Taylor for the costs and attorneys' fees expended in the course of litigating this action, pre-judgment and post-judgment interest; and

8.        Grant to Ms. Taylor whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 17th day of September, 2014.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

/s Jesse R. Dill
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Jesse R. Dill, State Bar No. 1061704

WALCHESKE & LUZI, LLC
200 South Executive Drive, Suite 101
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheskeke@walcheskeluzi.com
sluzi@walcheskeluzi.com
jdill@walcheskeluzi.com